Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS MENDOZA, derivatively on behalf of HF FOODS GROUP INC., | |
| Plaintiff, | Case No.: |
| v. | |
| ZHOU MIN NI, XIAO MOU ZHANG, CAIXUAN XU, JIAN MING NI, ZHEHUI NI, HONG WANG, CHAN SIN WONG, and REN HUA ZHENG, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| HF FOODS GROUP INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jesus Mendoza ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant HF Foods Group Inc. ("HF Foods" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Zhou Min Ni, Xiao Mou Zhang, Caixuan Xu, Jian Ming Ni, Zhehui Ni, Hong Wang, Chan Sin Wong, and Ren Hua Zheng (collectively, the "Individual Defendants," and together with HF Foods, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of HF Foods, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding HF Foods, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by HF Foods' directors, officers, and controlling shareholder from August 23, 2018 through the present (the "Relevant Period").

2. HF Foods, formerly known as Atlantic Acquisition Corp. ("Atlantic"), through its subsidiaries, is a leading food service distributor to Asian restaurants,

particularly Chinese restaurants, and other food service customers across the United States.  The Company boasts 14 distribution centers, a fleet of over 340 refrigerated vehicles, and over 10,000 Asian restaurant customers in 21 states.

3.     In March 2018, Atlantic entered into a merger agreement with a privately held North Carolina corporation, "HF Group Holding Corporation" ("HF Group"). Pursuant to the agreement, HF Group merged with a subsidiary formed by Atlantic and became the surviving entity and wholly owned subsidiary of Atlantic.

4.     In November 2019, HF Foods completed another business combination, this time, with another leading Asian restaurant distributor and wholesale supplier, B&R Global Holdings Inc. ("B&R Global") based in California, for approximately 30.7 million shares of HF Foods common stock.

5.     HF Foods conducts a significant amount of business with related parties through regular sales and purchases made during the normal course of business.

6.     Throughout the Relevant Period, the Individual Defendants caused the Company to consistently make statements in the Company's SEC filings and press releases that misrepresented the Company's business operations, prospects, and compliance, particularly with respect to the related party transactions HF Foods was engaged in. While the Company's SEC filings purported to accurately disclose, among other things, all related party transactions, the Company was actually engaging in numerous undisclosed related party activity, in addition to dubious disclosed activities, that enabled insiders to unjustly enrich themselves to the detriment of the Company and its shareholders.

7.     The truth was revealed to the public on March 23, 2020, when *Hidenburg Research* published a report disclosing (i) alarming similarities between HF Foods and two prior mergers orchestrated by Atlantic that ended in poor states; (ii) undisclosed links between B&R Global and the Company, suggesting that the massive merger between the companies was actually an undisclosed related party transaction, rather than one at

"arm's-length"; (iii) numerous red flags with HF Foods' related parties and purported use of shareholder cash, including the inexplicable purchase of exotic supercars for businesses affiliated with HF Foods; (iv) concerning issues with HF Foods' auditor; and (v) allegations of foul play with the amount of HF Foods' free floating shares for the FTSE/Russell indices (the "*Hidenburg* Report").

8.     On this news, the price of the Company's stock dropped from $12.32 per share at the close of the previous trading day on March 20, 2020, to $9.80 at the close of trading on March 23, 2020, a drop of over 20%.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by engaging in and or causing the Company to engage in numerous related party transactions (both disclosed and undisclosed) that resulted in the concealed enrichment of Company insiders and affiliates, including: (1) loaning or otherwise utilizing Company money for improper purchases and advances to the Chief Executive Officer's ("CEO") son's purported businesses and another Company subsidiary, including to purchase a fleet of exotic luxury supercars, such as Ferraris and others with vanity plates; (2) using HF Foods to shuffle cash through disclosed sales and purchases to dubious affiliates of the Company's CEO and other insiders; and (3) allowing related parties to effectively "loot" the Company with wholesale purchases, causing a collapse in the Company's wholesale margins (collectively, the "Related Party Misconduct").

10.     In further breach of their fiduciary duties during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make to the investing public a series of materially false and misleading statements about HF Foods' business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) HF Foods engaged in the Related Party Misconduct; and (2) the Company was "gaming" FTSE/Russell indices by

concealing the actual number of free floating shares. As a result of the foregoing, HF Foods' public statements were materially false and misleading at all relevant times.

11.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

12.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to continuously fail to maintain adequate internal controls throughout the duration of the Relevant Period, including by utilizing an independent auditor with questionable standing.

13.    Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while  at least one of the Individual Defendants breached their fiduciary duties by engaging in improper insider sales, obtaining proceeds of over $67,894.

14.    According to the Company's quarterly report filed with the SEC on a Form 10-Q on November 14, 2019, approximately 905,115 shares of the Company's stock were repurchased at inflated prices between September 1, 2019 and September 30, 2019 for approximately $12,038,029, the aggregate balance of principal and accrued interest on four unsecured loans. As the Company's stock was actually only worth $9.80 per share, the price at which it was trading on March 23, 2020, the Company overpaid approximately $3.16 million in total.

15.    In light of the Individual Defendants' misconduct, which has subjected HF Foods, its Co-CEOs, its Chief Financial Officer ("CFO"), and its former CFO to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets,

Verified Shareholder Derivative Complaint

the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Co-CEOs' liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of HF Foods' Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j, 78t), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

18. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an

individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

23.     Venue is proper in this District because HF Foods and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of HF Foods common stock. Plaintiff has continuously held HF Foods common stock at all relevant times.

### Nominal Defendant HF Foods

25.     HF Foods is a Delaware corporation with its principal executive offices located at 19319 Arenth Avenue, City of Industry, California 91748, as of May 4, 2020. Prior to May 4, 2020, the Company's principal executive offices were located at 6001 W. Market Street, Greensboro, North Carolina 27409. HF Foods' shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "HFFG."

### Defendant Min Ni

26.     Defendant Zhou Min Ni ("Min Ni") is the co-founder of HF Group, and has served as the Company's Chairman since 2018, and as the Company's Co-CEO since November 2019. Previously, Min Ni served as the Company's sole CEO from August 2018 until November 2019, and as HF Group's CEO and Chairman since its founding in 1997. According to the Company's Schedule 14A filed with the SEC on April 29, 2020 (the "2020 Proxy Statement"), as of April 20, 2020, Defendant Min Ni beneficially owned 13,772,713 shares of the Company's common stock, which represented 26.4% of

the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $6.31, Defendant Min Ni owned approximately $86.9 million worth of HF Foods stock.

27. For the fiscal year ended December 31, 2019, Defendant Min Ni purportedly received $400,000 in compensation from the Company.

28. The Company's 2020 Proxy Statement stated the following about Defendant Min Ni:

> **Zhou Min Ni,** together with his wife, Chan Sin Wong, founded HF Group. Mr. Ni has served as Chairman and Chief Executive Officer of HF Group for over 20 years since he founded the business in 1997. From 1997 to the present, Mr. Ni has been responsible for the supervision of the Company's strategy development, financing, acquisition, business expansion, inventory procurement and vendor management. Under his leadership, the Company developed into a well-recognized foodservice distributor operating three distribution centers serving over 3,200 Chinese/Asian restaurants in ten states in Southeastern America. We believe Mr. Zhou Min Ni's qualification to sit on our board of directors includes his extensive knowledge of the Company and the foodservice distribution industry serving Chinese/Asian restaurants, his 20 years of management and leadership experience in the Company, and his connections in Chinese/Asian American business society.

### Defendant Zhang

29. Defendant Xiao Mou (aka Peter) Zhang ("Zhang") has served as HF Foods' Co-CEO and as a Company director since November 2019. He also served as the Company's CFO from November 2019 until he resigned from that position on May 1, 2020. Previously, he served as Chairman of the Board of B&R Global, which he founded in 2014. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Zhang beneficially owned 3,089,354 shares of the Company's common stock, which represented 5.9% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020

was $6.31, Defendant Zhang owned approximately $19.4 million worth of HF Foods stock.

30. For the fiscal year ended December 31, 2019, Defendant Zhang received $93,494 in compensation from the Company. This included $85,000 in salary, and $8,494 in other compensation related to the personal use of an automobile provided by the Company.

31. The Company's 2020 Proxy Statement stated the following about Defendant Zhang:

> **Xiao Mou Zhang (aka Peter Zhang)**, has served as Co- Chief Executive Officer and Chief Financial Officer and a director since November 4, 2019. He served as Chairman of the Board, and as a Director of B&R Global from 2014 when he founded B&R Global with his partners, who are all originally from China. Mr. Zhang has over 20 years of experience in the food distribution industry with extensive experience in sales, marketing, financing, acquisitions, inventory, logistics and distribution. Under Mr. Zhang's leadership, B&R Global has established a large supplier network and maintains long-term relationships with many major suppliers stemming from business relationships that have been built up over the years. A large purchase volume and a centralized procurement process has also allowed B&R Global favorable negotiating power with vendors that source high quality products at lower prices than many competitors. By also establishing a call center in China, B&R Global has been able to grow its customer base and, at the same time, keep its operating costs low. We believe Mr. Zhang's qualification to sit on our board of directors includes his extensive knowledge of the food distribution industry, particularly serving Chinese/Asian restaurants, and his 20 years of management and leadership experience at B&R Global.

## Defendant Xu

32. Defendant Caixuan Xu ("Xu") has served as the Company's Vice President, Chief Accounting and Financial Reporting Officer since February 2019. She also served as the Company's CFO from April 2019 to November 2019.

33.     For the fiscal year ended December 31, 2019, Defendant Xu received $229,167 in compensation from the Company. This included $201,667 in salary, and $27,500 in bonus.

34.     The Company's 2020 Proxy Statement stated the following about Defendant Xu:

> **Caixuan Xu** has served as the Vice President, Chief Internal Control and Financial Planning Officer since November 4, 2019 and served as the Chief Financial Officer of HF Group from April 1, 2019 to November 4, 2019. Ms. Xu was hired by HF Foods on February 1, 2019. Ms. Xu has nearly 20 years of accounting and financial management experience. Prior to joining the Company, Ms. Xu served as the Vice President of Finance of Ninestar (Lexmark) since June 2018. Ms. Xu served as the Finance Director (Greater China CFO) for Red Hat from June 2017 until June 2018, and as the Chief Financial Officer of Shouqi Car Rental in Beijing, China from December 2016 through June 2017. Prior to that, she spent five years in finance positions with Lenovo in Morrisville, NC and Beijing, China, most recently as Senior Finance Manager and Controller. Before joining Lenovo, Ms. Xu held finance and auditor positions with Credit Suisse and PwC in Durham and Raleigh, NC, which followed her earlier career in public accounting firms (PwC and Tin Wha CPAs) in Beijing, China. Ms. Xu earned a BS in Accounting from The Central University of Finance and Economics in Beijing, China, and a Master's Degree in Business Administration from the Freeman School of Business in New Orleans, LA. She is a CPA, certified in both North Carolina and Beijing, China (inactive), and has passed all three levels of the Chartered Financial Analyst (CFA) exams.

**Defendant Jonathan Ni**

35.     Defendant Jian Ming Ni ("Jonathan Ni") served as the Company's CFO from August 2018 until his resignation in April 2019. Previously, he served as HF Group's CFO from 2008. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Jonathan Ni held voting and dispositive power over the shares owned by Irrevocable Trust for Raymond Ni, the CEO's son, which beneficially owned 5,591,553 shares of the Company's common stock. This represented 10.7% of the Company's outstanding shares of common stock on that date. Given that the price per share of the

Company's common stock at the close of trading on April 20, 2020 was $6.31, Defendant Jonathan Ni owned approximately $35.2 million worth of HF Foods stock.

**Defendant Ni**

36.     Defendant Zhehui Ni ("Ni") has served as a Company director since August 2018, and also serves as a member of the Audit Committee and the Compensation Committee.

37.     For the fiscal year ended December 31, 2019, Defendant Ni received $20,000 in compensation from the Company.

38.     The Company's 2020 Proxy Statement stated the following about Defendant Ni:

> **Zhehui Ni** has served as a director of HF Group since August 2018.  Ms. Ni has served as vice president of Shanghai Electric Investment Company since 2014, charged with strategic and financial investment. She worked as an associate at Haixiahuifu Investment Company from 2011 to 2013 and worked as a senior consultant in Deloitte Touche Tohmatsu Shanghai Office from 2007 to 2011. Ms. Ni is experienced in equity investment, corporate finance and investment-related tax structuring. Ms. Ni received a master's degree and bachelor's degree in international economical law from Shanghai Jiaotong University. She is a certified public accountant and certified tax accountant, and passed the bar exam in the People's Republic of China. We believe Ms. Ni's qualification to sit on our board of directors includes her knowledge in accounting, financial reporting, equity investment, corporate finance, and investment-related tax structuring.

**Defendant Wang**

39.     Defendant Hong Wang ("Wang") has served as a Company director since December 2019, and also serves as a member of the Audit Committee and the Compensation Committee. Previously, Defendant Wang served as a Company director from August 2018 until November 2019.

40.     For the fiscal year ended December 31, 2019, Defendant Wang received $20,000 in compensation from the Company.

Verified Shareholder Derivative Complaint

41.     The Company's 2020 Proxy Statement stated the following about Defendant Wang:

> **Hong Wang** has served as a director of HF Group since December 2019. Mr. Wang was previously a member of the Board of Directors of the Company from August 22, 2018, through November 1, 2019. Dr. Wang has served as a Professor of Management Information Systems at North Carolina A&T State University since 2005 and a Visiting Professor at Yunnan University of Finance and Economics in China since June, 2012, Dalian Maritime University in China since June 2012, and Henan Polytechnic University in China since June 2015. Dr. Wang has over 30 years of university teaching experience and has taught Management Sciences, Operations Research, Optimization, Business Environment, Management Concepts, Strategic Management, Engineering Economy, in addition to various Information Systems courses at both graduate and undergraduate levels. Dr. Wang is active in professional and community services. He has served in multiple cities in the US for several terms as president of local Chinese Associations, on various boards, as a principal of Chinese schools, as session chair of academic conferences, and as a journal referee. He also helped several Chinese universities to establish international programs in collaboration with US universities. Dr. Wang received his Ph.D. in Management Information Systems/Decision Sciences from Ohio State University. We believe Dr. Wang's qualifications to sit on our board of directors include his knowledge of management, operations, optimization, business environment, and economic engineering, and his prior effective service as a member of our board.

**Defendant Wong**

42.     Defendant Chan Sin Wong ("Wong") is the wife of Defendant Min Ni and co-founder of HF Group. She served as the Company's Chief Operating Officer, President, and as a Company director from August 2018 until November 2019.

43.     For the fiscal year ended December 31, 2019, Defendant Wong received $400,000 in compensation from the Company.

44.     The Company's Schedule 14A filed with the SEC on April 30, 2019 (the "2019 Proxy Statement") stated the following about Defendant Wong:

**Chan Sin Wong**, 53, the wife of Zhou Min Ni, co-founded the Company in 1997. She has served as Director and President of the Company for over 20 years since she co-founded HF Group in 1997. From 1997 to the present, Ms. Wong has been responsible for the operation and supervision of the Company, including sales, inventory, logistics distribution, human resources, regulations and legal compliance. She also led the development of the Company's logistics and distribution network. We believe Ms. Wong's qualification to sit on our board of directors includes her knowledge of the Company, her extensive expertise in Company operations, and established relationships with service providers.

**Defendant Zheng**

45.     Defendant Ren Hua Zheng ("Zheng") served as a Company director from June 2017, prior to the merger with Atlantic, until he resigned in December 2019. Defendant Zheng served as a member of the Audit Committee and the Compensation Committee during the Relevant Period.

46.     For the fiscal year ended December 31, 2019, Defendant Zheng received $20,000 in compensation from the Company.

47.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Zheng made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 9/6/2019 | 208 | $19.13 | $3,979 |
| 9/9/2019 | 500 | $18.61 | $9,305 |
| 9/10/2019 | 1,000 | $18.35 | $18,350 |
| 9/11/2019 | 2,000 | $18.13 | $36,260 |

Thus, in total, before the fraud was exposed, he sold 3,708 Company shares on inside information, for which he received approximately $67,894. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

48.     The Company's 2019 Proxy Statement stated the following about Defendant Zheng:

> **Ren Hua Zheng**, 48, has served as a director since June 2017. Mr. Zheng founded Hope Kitchen Cabinets and Stone Supply LLC, a cabinet decoration company in the United States, and has served as its Manager since January 2006. Mr. Zheng has served as Property Manager of H&C Brother LLC, Orland Property LLC, B&J Investment LLC, and 5904 5th Ave LLC since January 1999. We believe Mr. Zheng's qualification to sit on our board of directors includes his business experience in the areas of strategy implementation, sales and marketing, staff training, cost analysis, and financial budget supervision in enterprise operation.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of HF Foods and because of their ability to control the business and corporate affairs of HF Foods, the Individual Defendants owed HF Foods and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage HF Foods in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of HF Foods and its shareholders so as to benefit all shareholders equally.

50.     Each controlling shareholder, director and officer of the Company owes to HF Foods and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of HF Foods, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

Verified Shareholder Derivative Complaint

52.     To discharge their duties, the controlling shareholder, officers and directors of HF Foods were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of HF Foods, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised HF Foods' Board at all relevant times.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, including Defendant Min Ni as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.     To discharge their duties, the officers and directors of HF Foods were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of HF Foods were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to HF Foods' own Code of Conduct and Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how HF Foods conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of HF Foods and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that HF Foods' operations would comply with all applicable laws and HF Foods' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to HF Foods and the shareholders the duty of loyalty requiring that each favor HF Foods' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of HF Foods and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial, and controlling shareholder positions with HF Foods, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by HF Foods.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in

concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of HF Foods was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of HF Foods and was at all times acting within the course and scope of such agency.

### HF FOODS' CODE OF ETHICS

65.     The Company has adopted a Code of Ethics that applies to all officers, directors, employees, and independent contractors of the Company.

66.     The Code of Ethics[1] is designed to:

> deter wrongdoing and promote: (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (ii) full, fair, accurate, timely and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in our other public communications; (iii) compliance with applicable governmental laws, rules, and regulations; (iv) the prompt internal reporting of violations of the code to an appropriate person or persons identified in the code; and (v) accountability for adherence to the code.

67.     In a section titled "Honest and Ethical Conduct," the Code of Ethics maintained that:

> All directors, officers, employees and independent contractors owe duties to the Company to act with integrity. Integrity requires, among other things, being honest and ethical. This includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Deceit and subordination of principle are inconsistent with integrity.

68.     The same section outlined that afore-mentioned duties include, among others:

- To observe both the form and spirit of laws, governmental rules, regulations and accounting standards;

---

[1] The Company recently adopted a new Code of Ethics on April 20, 2020. https://hffoodsgroup.com/wp-content/uploads/2020/04/Code-of-Conduct-Ethics-Final.pdf. Last visited June 15, 2020.

Verified Shareholder Derivative Complaint

- Not to knowingly make any misleading statements to any person or to be a party to any improper practice in relation to dealings with or by the Company;

- To ensure that Company resources and properties are used properly;

- To maintain the confidentiality of information where required or consistent with Company policies; and

- Not to disclose information or documents relating to the Company or its business, other than as required by law, not to make any unauthorized public comment on Company affairs and not to misuse any information about the Company or its associates, and not to accept improper or undisclosed material personal benefits from third parties as a result of any transaction or transactions of the Company.

69. In a section titled, "Conflicts of Interest," the Code of Ethics stated the following:

A "conflict of interest" arises when an individual's personal interest interferes or appears to interfere with the interests of the Company. A conflict of interest can arise when a director, officer or employee takes actions or has personal interests that may make it difficult to perform his or her Company work objectively and effectively.

There are a variety of situations in which a conflict of interest may arise. While it would be impractical to attempt to list all possible situations, some common types of conflicts may be:

- To serve as a director, employee or contractor for a company that has a business relationship with, or is a competitor of the Company;

- To have a financial interest in a competitor, supplier or customer of the Company;

- To receive improper personal benefits from a competitor, supplier or customer, as a result of any transaction or transactions of the Company;

- To accept financial interest beyond entertainment or nominal gifts in the ordinary course of business, such as a meal or a coffee mug;

* * *

- To use for personal gain, rather than for the benefit of the Company, an opportunity that discovered through the role with the Company.

Fidelity or service to the Company should never be subordinated to or dependent on personal gain or advantage. Conflicts of interest should be avoided.

In most cases, anything that would constitute a conflict for a director, officer or employee also would present a conflict if it is related to a member of his or her family.

Interests in other companies, including potential competitors and suppliers, that are purely for management of the other entity, or where an otherwise questionable relationship is disclosed to the Board and any necessary action is taken to ensure there will be no effect on the Company, are not considered conflicts unless otherwise determined by the Board.

70.     The "Disclosure" section of the Code of Ethics further stated the following regarding the Company's disclosure controls and procedures:

Each director, officer or employee, to the extent involved in the Company's disclosure process, including the Chief Executive Officer or Chief Financial Officer, or their equivalents, the (the "Senior Financial Officers"), is required to be familiar with the Company's disclosure controls and procedures applicable to him or her so that the Company's public reports and documents comply in all material respects with the applicable securities laws and rules. In addition, each such person having direct or supervisory authority regarding these securities filings or the Company's other public communications concerning its general business, results, financial condition and prospects should, to the extent appropriate within his or her area of responsibility, consult with other Company officers and employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

Each director, officer or employee, to the extent involved in the Company's disclosure process, including the Senior Financial Officers, must:

- Familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.

- Not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self- regulatory organizations.

71.    In a section titled, "Compliance," the Code of Ethics provided that the Company's officers and directors must, "[c]omply with the law . . . [a]ct in the best interests of the Company. . . [and] [o]bserve the ethical principles of fairness, honesty and truthfulness, including disclosure of potential conflicts."

72.    In a section titled, "Fair Dealing," the Code of Ethics stated the following:

Our core value of operating is based on responsiveness, openness, honesty and trust with our members, business partners, employees and stockholders. We do not seek competitive advantages through illegal or unethical business practices. Each employee, officer and director should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

73.    In a section titled, "Reporting and Accountability," the Code of Ethics outlined the procedures for reporting violations of the Code, in the following manner:

Each director, officer or employee must:
- Notify the Chief Executive Officer or Chief Financial Officer, or their equivalents, promptly of any existing or potential violation of this Code.

- Not retaliate against any other director, officer or employee for reports of potential violations.

- The Company will follow the following procedures in investigating and enforcing this Code and in reporting on the Code:

- The Chief Executive Officer or Chief Financial Officer, or their equivalents, as the case may be, will take all appropriate action to investigate any violations reported. In addition, the Chief Executive Officer or Chief Financial Officer, or their equivalents, as appropriate, shall report each violation and alleged violation involving a director or an executive officer to the Chairman of the Board of Directors. To the extent he or she deems appropriate, the Chairman of the Board of Directors shall participate in any investigation of a director or executive officer. After the conclusion of an investigation of a director or executive officer, the conclusions shall be reported to the Board of Directors.

- The Board of Directors will conduct such additional investigation as it deems necessary. The Board will determine that a director or executive officer has violated this Code. Upon being notified that a violation has occurred, the Chief Executive Officer or Chief Financial Officer, or their equivalents, as the case may be, will take such disciplinary or preventive action as deemed appropriate, up to and including dismissal or, in the event of criminal or other serious violations of law, notification of appropriate law enforcement authorities.

74.   In a section titled, "Protection and Proper Use of Company Assets," the Code of Ethics maintained that "All employees, officers and directors should protect the Company's assets and ensure their efficient use. All Company assets should be used only for legitimate business purposes. Theft, careless and waste have a direct impact on our profit."

75.   The Individual Defendants violated HF Foods' Code of Ethics by engaging in or permitting the schemes to engage in the Related Party Misconduct, to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, and failing to report the same. Moreover, Defendant Zheng violated the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants

failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and act in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

76.    HF Foods, through its subsidiaries, is a leading food service distributor to Asian restaurants, particularly Chinese restaurants, and other food service customers across the United States.  The Company boasts 14 distribution centers, a fleet of over 340 refrigerated vehicles, and over 10,000 Asian restaurant customers in 21 states.

77.    Prior to changing its corporate name in August 2018, HF Foods, was formerly known as a special purpose acquisition company called Atlantic Acquisition Corp. Atlantic was incorporated in Delaware in May 2016, in order to acquire, through a merger, share exchange, asset acquisition, or other business combination, one or more business entities.

78.    In March 2018, Atlantic entered into a merger agreement with HF Group. Pursuant to the agreement, HF Group merged with a subsidiary formed by Atlantic and became the surviving entity and wholly owned subsidiary of Atlantic. The merger transaction resulted in the stockholders of HF Group becoming majority holders of Atlantic's shares and Atlantic changing its name to HF Foods Group Inc. The founders and principals of HF Group, Defendant Min Ni and his wife, Defendant Wong, respectively, became the CEO and Chairman of the Company's Board, and President and member of the Board in connection with the business combination.

79.    In November 2019, HF Foods completed another business combination, this time, with a large Asian restaurant distributor and wholesale supplier, B&R Global, based in California, for approximately 30.7 million shares of HF Foods common stock. Pursuant to the merger agreement, B&R Global became a wholly owned subsidiary of HF Foods, creating, according to Min Ni, "the largest distributor to Asian restaurants" in the

United States.[2] In 2018, the companies generated a combined revenue of over $800 million. Additionally, in connection with the merger, Defendant Zhang, the former Chairman and CEO of B&R Global became the Co-CEO of HF Foods, along with Min Ni, and CFO of the Company.

### The Related Party Misconduct

80.    HF Foods discloses that it conducts a significant amount of business with related parties through regular sales and purchases made during the normal course of business. Unbeknownst to the investing public, however, many of these transactions involve(d) the improper use of shareholder cash and Company assets. As the *Hidenburg* Report revealed, the Company has engaged in undisclosed related party transactions and its numerous disclosed transactions with purported affiliates are otherwise littered with red flags.

*Undisclosed Link Between B&R Group and HF Foods*

81.    On June 25, 2019, HF Foods filed a current report on Form 8-K announcing that it had entered into a merger agreement with B&R Group and a wholly owned subsidiary of the Company created for acquisition purposes. The merger agreement between HF Foods and B&R Group provided that the transaction was negotiated at "arm's-length." However, *Hidenburg Research*'s investigations uncovered formal ties between both companies, tracking back to 2012. Both were under the same Chinese investment group, American International Rongjin Investment Group and closely affiliated through this investment vehicle. According to the *Hidenburg* Report, an interview with the Present of Fujian Rongjin Group in 2018 confirmed that both HF Foods and B&R Group were under the same umbrella and utilized by the group to distribute food in the United States.

---

[2]https://www.just-food.com/news/us-based-hf-foods-group-to-merge-with-local-wholesaler-br-global-holdings_id141749.aspx. Last visited June 15, 2020.

Verified Shareholder Derivative Complaint

82.   The business combination was valued at a massive $509 million and included HF Foods issuing 30.7 million shares to former B&R Group shareholders, effectively doubling HF Foods' outstanding shares, and adding $101 million in debt to HF Foods' balance sheet.[3] The affiliation between the companies, however, remained undisclosed.

*Undisclosed Enrichment in the Form of Loans and/or Advances to Min Ni's Teenage Son's "businesses" and Inexplicable Purchases of Luxury Supercars*

83.   In 2019 alone, the Company executed over 40 related party transactions involving over $40 million in purchases and $19.3 million in sales.[4] The *Hidenburg* Report revealed that one of the Company's subsidiaries, Truse Trucking, Inc. owned, as expected, numerous refrigeration trucks presumably utilized to deliver food products to the Company's customers.

84.   Inexplicably, a background check of the vehicle assets of Truse Trucking, Inc. also revealed a fleet of exotic luxury supercars, such as Ferraris, a Bentley, a Porsche, and other luxury vehicles equipped with profane vanity plates.  Moreover, the cars have been traced to Min Ni's teenage son, Raymond, who publicly showcases his "stable" of cars.

85.   These luxury vehicles, utilized by Min Ni's son for personal purposes, have never been accounted for in Min Ni's compensation from the Company.

*Disclosed Sales and Purchases to Dubious Affiliates of Defendant Min Ni and Other Insiders*

86.   A look at the Company's SEC filings quickly reveals that most of the reported related party transactions take place with companies owned by Min Ni and/or his immediate family members. For example, Min Ni's teenage son purportedly owns

---

[3]https://www.sec.gov/Archives/edgar/data/1680873/000143774920000824/fooh2020011 7_8k.htm. Last visited June 15, 2020.
[4]https://www.sec.gov/Archives/edgar/data/1680873/000143774919019423/fooh2019092 7_defm14a.htm. Last visited June 15, 2020.

100% of "Revolution Industry," and "Revolution Automotive," both of which are based out of HF Foods' recent headquarters.[5] There are no discernable signs that either entities are operative businesses. The only assets of Revolution Automotive, are 9 Ferraris as uncovered by the *Hidenburg* Report. Similarly, several other related entities that HF Foods shuffled a significant amount of money to are registered to the Company's recent corporate address and/or have no outward presence of operating business activity. Furthermore, some related party entities outwardly identify as part of HF Foods to customers—but are represented as separate entities to the investing public by the Company.

87.     These entities, and the amount spent on them by HF Foods, as described in the *Hidenburg* Report, include the following:

**Over $1 Million Of Shareholder Cash Has Gone to UGO USA Inc., Another Related-Party Entity Registered to HF Foods' Headquarters with Few Signs of Operations**

HF Foods has made almost $1 million of purchases over the past 2 years from UGO USA, Inc, another related-party entity based out of HF's headquarters. According to company filings, HF's Chairman/CEO owns a 30% equity interest in UGO.

We found little evidence that UGO is an actual operating business, though it appears it had taken steps to become one in the past. In 2016, the entity filed a trademark application [] for "on-line retail store services featuring Asian snacks, Asian beauty products, Asian health supplements, Asian home appliances, and Asian restaurant supplies." We were unable to locate any online store or online presence.

**$11.6+ Million of Shareholder Cash Went to Eastern Fresh, An Entity HF Foods Claims is a Separate Business. Signage at the Facility Has HF's Logo, Indicating Otherwise**

---

[5] Tellingly, the Company changed its corporate headquarters in May 2020.

Since 2017, HF has directed $11.6 million into Eastern Fresh LLC, a company that HF's Chairman/CEO owns a 30% equity interest in. [] Eastern Fresh appears to be registered as "Eastern Fresh NJ LLC []", a distributor based in New Jersey.

Despite HF filings claiming that Eastern Fresh is not a subsidiary (but rather a separate related-party), its signage appears to bear the logo of HF's customer-facing subsidiary [], Han Feng, Inc.

\* \* \*

Again, HF appears to be presenting a unified face to customers, while separating these entities from investors. This is consistent with what we would expect if these entities are being used to funnel out shareholder cash.

**$1.8 Million in Shareholder Cash Went to Related-Party Fortune One Foods. Once Again, HF Foods' Filings Describe it as a Separate Entity. But Fortune One Describes Itself as Being a Part of HF Foods**

HF's Chairman/CEO indirectly owns a 17.5% equity interest in Fortune One Foods Inc. [] HF has made about $1.8 million in purchases from the entity, according to company filings. [] Although filings claim that Fortune One is not an HF subsidiary, but instead a separate related-party entity, Fortune One appears to brand itself as if it were part of HF.

\* \* \*

We also called the number listed on its Facebook page [] and asked a representative point blank if it was an independent business or if it was part of Han Feng. His reply (which we have recorded) was: "Yeah we are a part of Han Feng." . . .

\* \* \*

**NC Noodle, A Related-Party Owned By HF's Previous CFO, Made ~$4.2 Million In Sales To HF, But Our On-The-Ground Research Showed Its Premises To Be Largely Vacant**

HF states that the company's recently departed CFO owns a 66% equity interest in NC Noodle. [] Based on HF's disclosures, we estimate that NC Noodle sold ~$4.2 million to HF in 2019 alone, yet we found no customer facing business presence online.

*Collapse in the Company's Wholesale Margins*

88.     Immediately following the Company's initial public offering in August 2018, HF Foods experienced a 33% collapse in its wholesale margins due to related parties who benefitted from the compression. While the Company disclosed that the decrease in margins resulted from increased sales to related parties, it purported that the decrease resulted from higher volume sales. However, the Company's SEC filings did not reflect any meaningful increase in the Company's related business when compared to previous years.

### Failures to Maintain Internal Controls

89.     In addition to the Company's blatant engagement in undisclosed and suspicious disclosed related party transactions, the Individual Defendants have allowed the Company to employ an independent auditor with questionable history and performance. Outside of the uncovered Related Party Misconduct, which remained unknown from the investing public, HF Foods has been operating with deficient internal controls since December 2018, at least, which have only grown since that period.

90.     On April 1, 2019, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K disclosed that a material weakness had been identified in the Company's internal controls, rendering them ineffective, due to *inter alia*, "the lack of proper documentation to evidence the review of customer orders and purchase orders, and lack of proper documentation to evidence customers' acknowledgement of transaction amounts and account balances."

91.     On March 16, 2020, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K revealed that HF Foods continued to operate without effective internal controls due to material weaknesses related to the inexperience of in-house accounting personal, the Company's failure to maintain effective information technology ("IT") general controls, and control

deficiencies related to the lack of proper documentation to evidence the management review in various business processes.

92.     Throughout the Relevant Period, and still today, HF Foods' independent auditor has been Friedman LLP ("Friedman"). According to the *Hidenburg* Report, Friedman also served as the independent auditor for iFresh Holdings, another entity linked to Atlantic. On March 6, 2020, iFresh Holdings announced that it and Friedman had been subpoenaed by the SEC relating to the audits of the company.

93.     Moreover, a recent inspection by the Public Company Accounting Oversight Board ("PCAOB") found material issues with Friedman's audit of three unnamed issuers. The report issued by the PCAOB found significant weaknesses with Friedman's audits, including "(a) failures to test the controls and valuation of revenue, (b) failure to test controls over inventories and (c) the failure to perform sufficient procedures to test the existence of investments." (internal quotations removed).

### False and Misleading Statements

#### *August 23, 2018 Press Release*

94.     On August 23, 2018, the Company (known as Atlantic at the time) issued a press release announcing the "consummation of its business combination with privately-held HF Group Holding Corporation." The press release also announced Atlantic's name change to HF Foods Group Inc., and the Company's changed ticker symbol on NASDAQ from "ATACU, ATAC, ATACR" to "HFFG." The press release further disclosed that, "[a]s a result of the completion of the business combination,  the former shareholders of HF Group Holding Corporation will be issued 19.97 million shares of stock (representing approximately 88.5% of the outstanding common stock) at a value of $10.00 each, based on a $199.7M valuation of the combined company."

#### *August 27, 2018 Form 8-K*

95.     On August 27, 2018, HF Foods filed with the SEC a current report on Form 8-K, signed by Defendant Jonathan Ni that further detailed the merger and acquisition

transaction between Atlantic and HF Group, including the background of the merger transactions, consideration provided to HF Group stockholders, and the current amount of outstanding shares of common stock of the Company, among other information. The 8-K specifically stated in relevant part:

> Pursuant to the Merger Agreement, HF Group merged with HF Merger Sub and HF Group became the surviving entity (the "Merger") and a wholly-owned subsidiary of Atlantic (the "Acquisition"). Additionally, upon the closing of the transactions contemplated by the Merger Agreement (the "Closing"), (i) the stockholders of HF Group became the holders of a majority of the shares of common stock of Atlantic, and (ii) Atlantic changed its name to HF Foods Group Inc. (collectively, these transactions are sometimes referred to as the "Transactions").

> * * *

> At closing on August 22, 2018, Atlantic issued the HF Group stockholders an aggregate of 19,969,831 shares of its common stock, equal to approximately 88.5% of the aggregate issued and outstanding shares of Atlantic's common stock. The pre-Transaction stockholders of Atlantic own the remaining 11.5% of the issued and outstanding shares of common stock of the combined entities.

> * * *

> After giving effect to the Transactions, there are currently 22,558,492 shares of Atlantic's common stock issued and outstanding (without giving effect to the post closing cancellation of 390,000 shares held by an unaffiliated stockholder as described on page 4 of this Report on Form 8-K). Upon the Closing, Atlantic's rights and units ceased trading and Atlantic's common stock commenced trading on Thursday, August 23, 2018 on the Nasdaq Capital Market under the symbol "HFFG".

### September 13, 2018 Form 8-K

96.     On September 13, 2018, HF Foods filed with the SEC a current report on Form 8-K, signed by Defendant Jonathan Ni, describing the appointment of certain

officers and election of directors pursuant to the Merger Agreement. Defendant Min Ni's employment with the Company was described as follows:

> The Company's agreement with Mr. Zhou Min Ni provides that he will serve as Chief Executive Officer of the Company and its subsidiaries. The agreement has a term which expires August 31, 2023. The agreement provides for automatic extensions of additional one-year terms unless either party provides written notice of termination at least 90 days prior to the termination date. **Mr. Ni's base salary is $400,000 per year** and he is eligible for bonus awards based upon criteria which may be set from time to time by the Compensation Committee of the Board of the Company. He is eligible to receive benefits such as health care and related benefits as provided to other senior officers of the Company. There are no equity awards under the agreement.

(Emphasis added.)

### *November 11, 2018 Form 10-Q*

97.     On November 11, 2018, the Company filed with the SEC its quarterly report for the third fiscal quarter ended September 30, 2018 on Form 10-Q (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Min Ni and Jonathan Ni, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Min Ni and Jonathan Ni attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 3Q18 10-Q further purported to identify and disclose all related party transactions.

### *April 1, 2019 Form 10-K*

98.     On April 1, 2019, HF Foods filed the 2018 10-K., which was signed by Defendants Min Ni, Jonathan Ni, Wong, Zheng, Wang, and Ni, and contained SOX certifications signed by Min Ni and Jonathan Ni attesting to the accuracy of the 2018 10-K. The 2018 10-K purported to identify and disclose all related party transactions.

99.    The 2018 10-K also disclosed a significant collapse in the Company's wholesale gross margins, and decrease in wholesale revenue, which the Company attributed to increased sales to related parties, who purportedly purchased larger quantities than third parties. The 2018 10-K specifically noted in relevant part:

> Gross margin for our wholesale segment decreased by $440,000, or 32.1%, and our wholesale revenue decreased by $1.2 million or 6.2%. The decrease in margins resulted form increased sales to related parties relative to total wholesale revenue in 2018 as compared to 2017. The wholesale price for related parties is generally lower than third party customers due to the larger quantities purchased by related parties resulting in lower margin than the sales made to third parties. For the year ended December 31, 2018, 96.3% of the wholesale revenue was generated by related parties, compared to 92% in 2017.

### 2019 Proxy Statement

100.   On April 30, 2019, the Company filed the 2019 Proxy Statement. Defendants Min Ni, Wong, Zheng, Wang, and Ni solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act which contained material misstatements and omissions.[12]

101.   The 2019 Proxy Statement stated, regarding the Company's compensation program:

> We design our executive compensation program to implement our core objectives of attracting and retaining superior executive talent, motivating and rewarding executives whose knowledge, skills and performance are critical to our business, ensuring executive compensation is aligned with our corporate strategies and business objectives, and aligning executives' incentives with the creation of stockholder value.

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

102.   In regard to "Certain Relationship and Transactions with Related Persons," the section stated:

> Mr. Zhou Min Ni, the Chief Executive Officer, Chairman of the Board of Directors, and beneficial owner of 30.2% of the Company's outstanding shares of common stock, and certain of his immediate family members have ownership interests in various companies (the "Related Parties") involved in (i) the distribution of food and related products to restaurants and other retailers and (ii) the supply of fresh food, frozen food, and packaging supplies to distributers.
>
> The Company purchases products from and sells products to some of these Related Parties which at times also involve making advance payments to, or receiving advance payments from, these Related Parties. Prices paid for these goods are based on the prices published by the particular Related Party. The Board of Directors has analyzed the prices paid to these Related Parties as well as the level of service, reliability, delivery terms, and historical performance of these Related Parties and has concluded that such prices and terms are substantially equivalent to, or more advantageous than, prices and terms the Company would receive in arm's length transactions from third parties that have no relationship with the Company and are capable of providing the same level of service. Sales to Related Parties consist primarily of sales to distributers. These sales permit the Company to purchase certain items from manufacturers in larger quantities which at times, results in better purchase prices for the Company. The Company also leases to a Related Party, on commercially reasonable terms, a warehouse and distribution facility near Savannah, Georgia, which promotes a relationship that helps the Company source a reliable supply of fresh and frozen seafood. In addition to these factors, the Board of Directors believes that Mr. Zhou Min Ni's extensive experience and contacts in the foodservice industry, including the numerous companies in which he has an ownership interest, provide valuable insight into industry trends and access to products, pricing and customers that the Company would not otherwise be exposed to.

103.   The 2019 Proxy Statement further stated, in part, regarding "Say-on-Pay" that, "stockholders are entitled to vote at the Annual Meeting to approve the compensation of our named executive officers . . . . Although the vote is non-binding, our board of directors and the compensation committee value the opinions of our

stockholders and will consider the outcome of the vote when making future compensation decisions affecting our executive officers."

104.   However, with regard to the compensation program, the 2019 Proxy statement was false and misleading because it failed to disclose that the shares and value of HF Foods were artificially inflated, rendering the executive compensation undeserved and excessive and the shareholders unable to make informed votes. In addition, the related transactions section purported to disclose all related party transactions.

105.   Furthermore, the statements in the 2019 Proxy Statement were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) HF Foods engaged in the Related Party Misconduct; and (2) the Company was "gaming" FTSE/Russell indices by concealing the actual number of free floating shares. As a result, the Company's statements regarding HF Foods' business, operations, compliance, and prospects were materially false and misleading.

### May 15, 2019 Form 10-Q

106.   On May 15, 2019, the Company filed with the SEC its quarterly report for the first fiscal quarter ended March 31, 2019 on Form 10-Q (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Min Ni and Xu, and contained SOX certifications signed by Defendants Min Ni and Xu attesting to the accuracy contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 1Q19 10-Q further purported to identify and disclose all related party transactions.

### June 25, 2019 Form 8-K

107.   On June 25, 2018, HF Foods filed with the SEC a current report on Form 8-K, signed by Defendant Min Ni, describing the merger agreement and acquisition of

B&R Global. The 8-K failed to mention that B&R Global was a related party and also stated that, "[u]pon the closing of the transactions contemplated in the Merger Agreement, Merger Sub will merge with and into B&R, resulting in B&R becoming a wholly owned subsidiary of HF. The former shareholders of B&R will receive 30,700,000 shares of HF common stock as consideration for the merger."

### August 14, 2019 Form 10-Q

108.   On August 14, 2019, the Company filed with the SEC its quarterly report for the second fiscal quarter ended June 30, 2019 on Form 10-Q (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Min Ni and Xu, and contained SOX certifications signed by Defendants Min Ni and Xu attesting to the accuracy contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2Q19 10-Q further purported to identify and disclose all related party transactions.

### March 16, 2020 Form 10-K

109.   On March 16, 2020, HF Foods filed the 2019 10-K., which was signed by Defendants Min Ni, Xu, Zhang, Ni, Wang, and non-party Xi Lin ("Lin") and contained SOX certifications signed by Min Ni and Zhang attesting to the accuracy of the 2019 10-K. The 2019 10-K purported to identify and disclose all related party transactions. The 2019 10-K detailed the previously disclosed merger between HF Foods and B&R, and stated the following about HF Foods' shares: "[a]s of March 13, 2020, the registrant had 52,145,096 shares of common stock issued and outstanding."

110.   The statements in ¶¶ 94–99 and 106-109 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) HF Foods engaged in the Related Party Misconduct; and (2) the Company was "gaming" FTSE/Russell indices by concealing the actual number of

free floating shares. As a result of the foregoing, HF Foods' public statements were materially false and misleading at all relevant times.

### The Truth Emerges

111.  On March 23, 2020, *Hidenburg Research* published the *Hidenburg* Report disclosing (i) alarming similarities between HF Foods and two prior mergers orchestrated by Atlantic that ended in poor states; (ii) undisclosed links between B&R Global and the Company, suggesting that the massive merger between the companies was actually an undisclosed related party transaction, rather than one at "arm's-length"; (iii) numerous red flags with HF Foods' related parties and purported use of shareholder cash, including the inexplicable purchase of exotic supercars for businesses affiliated with HF Foods; (iv) concerning issues with HF Foods' auditor; and (v) allegations of foul play with the amount of HF Foods' free floating shares for FTSE/Russell index qualifications.

112.  The *Hidenburg* Report revealed that HF Foods and B&R Global were affiliated under the same Chinese investment group from as early as 2012, suggesting that the $509 million merger, which HF Foods represented was an arm's-length transaction, was just another related party transaction that HF Foods failed to disclose, among others. Specifically, the *Hidenburg* Report stated in relevant part:

> ***HF's massive $509 million merger with food distributor B&R appears to be a blatant undisclosed related-party transaction.*** The company claimed that the deal was negotiated at "arm's length", but we found multiple documents showing that both HF and B&R were part of the same Chinese investment group for years prior to the acquisition.

> \* \* \*

> We found that the massive $509 million merger with B&R appears to be an undisclosed related-party transaction.

> \* \* \*

> **HF Foods' Massive $509 Million Merger with B&R Appears To Be Just One of Dozens of Suspicious Related-Party Transactions**

Our review of HF Foods uncovered a staggering number of related-party transactions, both disclosed and undisclosed, that we believe are suspicious.

\* \* \*

*We believe insiders are using these dozens of related-party transactions to suck cash out of the business, eventually leaving shareholders with a hollow, debt-laden company.*

**Undisclosed Related-Party Transactions: HF Group Had Clear Ties to B&R Before Consummating its $509 Million "Arm's-Length" Deal, Yet None of It Was Disclosed to Shareholders**

In June 2019, HF Foods announced [] it would be merging with B&R Global Holdings, a West Coast food distribution company. The merger [] was a 2-part transaction valued at a massive $509 million.

It included HF Foods issuing 30.7 million shares to former B&R shareholders, more than doubling the company's outstanding share count and adding []~$101 million in debt to the balance sheet.

According to deal documents, the acquisition process started when HF's CEO phoned B&R's CEO in October 2018. [] *The deal documents describe the transaction as being negotiated "at arm's-length".* []

Contrary to those representations, we found longstanding formal ties between HF Foods and B&R:

- *HF and B&R were both under the umbrella of the same investment group, the American International Rongjin Investment Group,[] according to an announcement [] by the Chinese Ministry of Commerce in 2012.*[]
- In 2012, an affiliate of the above-named entity also affirmed [] that HF and B&R are part of the same investment holding group.
- *A May 2018 interview [] with the President of Fujian Rongjin Group [], Zhang Yi Tuan (张贻团) also affirmed the relationship.* According to the interview, the American International Rongjin Investment Group's distribution business operates in the U.S. and includes both HF and B&R. According to the interview, the group

37

Verified Shareholder Derivative Complaint

uses B&R as its official American headquarters and works with HF Foods and others to jointly distribute food in the U.S.

Instead of being "at arm's length", these entities look to have been closely affiliated through the same investment group for at least 8 years, which we believe clearly makes them related-parties.

***These intricate pre-existing connections represent a major conflict of interest, yet none of this was disclosed to investors prior to, or after, the merger.***

(Emphases added.)

113.   The *Hidenburg* Report also pointed out numerous instances of improper use of shareholder funds, including in connection with HF Foods' disclosed related party transactions. *Hidenburg Research's* investigations revealed that these transactions, described in detail above, involved undisclosed compensation to Defendant Min Ni, via payments to Min Ni's teenage son, Raymond Ni, and questionable "businesses" to inexplicably fund fleets of luxury exotic cars.  The *Hidenburg* Report stated in relevant part:

HF has transacted with at least 43 separate related-party entities in 2019 alone. ***Several are based out of the company's own headquarters and appear to have no operations.*** We visited others across the country and found red flags suggesting that these related parties are being used by insiders to extract cash from the business.

We discovered that the company's trucking subsidiary, ostensibly set up to transport food products, ***appears to have also used shareholder cash to purchase an undisclosed fleet of exotic supercars including Ferraris, Porsches, and a Bentley. We found photos of the Chairman's teenage son bragging on Instagram about them being his vehicles.***
***HF also directed over $2 million of shareholder cash to business entities owned by the Chairman's teenage son, including one that bought another fleet of 7 Ferraris*** . . .

* * *

**$4 Million Of Shareholder Cash Was Used for Purchases and Advances to Revolution Industry, An Entity Based Out of HF Foods' Headquarters, Owned 100% By The Chairman/CEO's Son, That Was**

38

**Formed 1 Month Prior to the IPO Deal, With No Visible Signs of an Actual Business**

HF Foods discloses transacting ~$3.3 million in purchases from, and directing over $700 thousand in advances to Revolution Industry. [] Revolution Industry is 100% owned by the Chairman/CEO's son and claims to do business in "food processing" and "distribution" according to its North Carolina corporate [] filings.

***We find it suspicious that HF Foods directed ~$4 million in business to the Chairman's son, who was likely a senior in high school at the time***, according to social media posts.

\* \* \*

***We found no signs that Revolution Industry is an actual business—no website, no social media profile, and no evidence of it having customers.*** Even more suspicious, North Carolina corporate records [] show that **the entity is registered to the same address as** [] **HF Foods' headquarters**: 6001 West Market Street, Greensboro North Carolina[.]

\* \* \*

What kind of food could HF be distributing to an entity based out of its own address? We think the only thing being distributed is money to insiders.

\* \* \*

**Undisclosed Insider Enrichment: An HF Subsidiary Owns a Fleet of Ferraris and Exotic Luxury Supercars, Paid for By Shareholders.**

**The CEO's Son Bragged About Them Being His Cars on Instagram**

In another series of highly irregular transactions, we examined the assets of Truse Trucking, a company subsidiary[.] [Image omitted.]

\* \* \*

In addition to the fleet of trucks, however, our background check showed that Truse owns an undisclosed fleet of exotic luxury supercars, including Ferraris, a Bentley, a Porsche, and other high-end vehicles . . . These, we presume, are not used to deliver raw and refrigerated food products to the company's customers.

For example, a 2013 Bentley Continental, with an MSRP of $193,000, the license plate "99Pr0BZ" and previous license plate "BENTOVER", is titled and registered to Truse.

We could think of no business justification for just about any public company purchasing Ferraris or Bentleys with shareholder money. *The HF Chairman/CEO's son puts these vehicles to apparent personal use, bragging openly about his "stable" of cars on his public Instagram [] account* (we expect he'll soon discover privacy settings). . . [Image omitted.]

A **Ferrari, with an MSRP of $319,995** and the license plate "WANTMY" is also registered to Truse Trucking, according to our background check. [Image omitted.]

We matched this Ferrari and the "WANTMY" license plate to the Chairman/CEO's son's Instagram account[.] [Image omitted.]

*In total, we found 8 luxury supercars valued at a ~$1.5 million MSRP registered to and owned by Truse Trucking[.]* [Image omitted.]

*Nowhere do we see any of these cars disclosed as compensation. The Chairman/CEO's executive salary supposedly consisted of $400,000 in cash[.]*

\* \* \*

**$483,000 in Loans to Revolution Automotive, Another Related-Party Entity Owned 100% by the Chairman/CEO's Son to Buy Yet More Ferraris**

\* \* \*

HF Foods also extended $483,000 in loans to the similarly named "Revolution Automotive" (not to be confused with the above-mentioned "Revolution Industries"). These loans were distributed around the time of the March 2018 take-public deal announcement. []

*Revolution Automotive is also 100% owned by the Chairman/CEO's son, according to HF Foods' filings [], and is also registered to the address of HF Foods' headquarters, according to the North Carolina Secretary of State []. Once again, we couldn't find any business operations by "Revolution Automotive".* [Image omitted.]

The only discernible assets held by Revolution Automotive are titles to 9 Ferraris, according to our background check[.]

* * *

As to the loan balance owed to shareholders, the Chairman/CEO recently paid it off personally with shares of illiquid HF stock. [] This, in our view, allowed him to draw cash out of the business in exchange for nearly worthless paper.

114.   The *Hidenburg* Report questioned the Company's dealings with related parties—many of which had no discernable business operations, suggesting possible sham companies concocted to discreetly shuffle Company money to insiders, as detailed above.

In addition to undisclosed related-party transactions, the company has also **conducted dozens of irregular disclosed related-party transactions**.

In total, the company transacted with 43 related-party entities in 2019 alone. [] In 2019, HF Foods reported over $40 million in purchases and $19.3 million in sales to related-party entities. []

***Our investigation uncovers related entities with (a) minimal or no online presence, (b) no signage or apparent operations at their respective registered addresses and (c) entities held out as separate companies to investors that appear to actually be operating as part of HF.***

***We believe insiders are using these dozens of related-party transactions to suck cash out of the business***, eventually leaving shareholders with a hollow, debt-laden company.

115.   The *Hidenburg* Report further examined the Company's explanation for its collapsed wholesale margins, and concluded that it was, at best, "puzzling."

**HF's Disclosed Related-Party Transactions: Wholesale Margins to These Entities Collapsed Immediately After the IPO. Cash Seems to Be Slipping Out the Back Door**

***HF reported a ~33% collapse in its wholesale gross margins in the quarter after it went public***, by related-parties that presumably benefitted from the margin compression. [Image omitted.]

> ***The company acknowledges that the margin decline was due to related-party sales***, but tried to explain it away by citing volume discounts[.] [Internal quotation omitted.]

> This explanation is puzzling. Sales only grew ~3% year over year for the comparable 2019/2018 9-month period, so there was no surge in volume.

> ***Furthermore, the company disclosed that related parties constituted 92% of wholesale segment sales in 2017[], making it impossible for related business to have meaningfully increased. []*** [Emphasis added.]

> Our investigation of these related-party entities uncovers a different explanation for why the company's sudden wholesale margins have collapsed: **insiders appear to be looting the place**.

116.   Lastly, with respect to HF Foods' alleged foul play of the FTSE/Russell Index criteria, the *Hidenburg* Report pointed out the error in HF Foods' free floating shares reflected on FTSE/Russell indices, and maintained that the Company was likely manipulating the index rebalancing process through shares held by family or affiliates, which serve to constrain the true free-float—exposing those shares to forced selling. Specifically, the *Hidenburg* Report stated in relevant part:

> The B&R merger more than doubled HF's share count. However, FTSE/Russell mistakenly included almost all of these shares as part of the company's free float, which sent HFFG's price and volume soaring on Friday's index rebalancing. We think this mistake may be reversed.

> ***We believe HF and its insiders are masking the true number of shares held by its affiliates.*** Once made clear to FTSE/Russell, we expect the recent forced index buying in HF will reverse and become forced selling.

> * * *

> FTSE/Russell had calculated HFFG's free float to be 21.8 million shares (per its subscription-only service). **This calculation was just flat out wrong**. The freely tradable shares were **6.2 million** per HF's own recent March filing. [] The source of the mistake appears to have been the accidental addition of shares from the B&R transaction, which closed in

November []. As with every such merger, shares issued to the acquirees are restricted for at least 6 months, according to SEC Rule 144 []. FTSE/Russell apparently missed this and added the shares to its free float calculation anyway. We think FTSE/Russell should reverse this decision, which would lead to a forced selling of the shares purchased.

Beyond the above, which appears to largely be a FTSE/Russell error, sometimes *companies are able to juke the index rebalancing process to ensure that the actual free float [] is tighter than it appears. We think this may also be taking place.*

For example, as shown earlier, *to the extent that shares are held by family members or affiliates (potentially through dozens of related-party entities), this can serve to constrain the true free float. Given the sheer consistency of the index rebalancing irregularities around HF (and Wins, backed by the same sponsor), we believe this to be likely.* To the extent Russell takes action, forced sales by passive investors could add severe selling pressure to HF's shares.

(Emphases added.)

117.   On this news, the price of the Company's stock dropped from $12.32 per share at the close of the previous trading day on March 20, 2020, to $9.80 at the close of trading on March 23, 2020, a drop of over 20%.

### **Repurchases During the Relevant Period**

118.   During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

119.   According to the Company's Form 10-Q filed with the SEC on November 14, 2019, the Company spent an approximate aggregate amount of $12,038,029 to repurchase 905,115 shares of its own common stock from the period of September 1, 2019 through September 30, 2019, at an average of $13.30 per share.

120.   As the Company stock was actually only worth $9.80 per share, the price at the close of trading on March 23, 2020, the Company overpaid approximately $3.16 million in total for these repurchases.

121.   According to the Company's 2019 10-K, on September 30, 2019, the Individual Defendants caused the Company to repurchase 632,746 shares of HF Foods common stock at an average price of $13.30 per share from Defendant Min Ni in exchange for the sale of the outstanding balance of certain Company notes in the amount of $8,415,525.

122.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $3.50 more than the actual worth of each share. Thus, the total over payment by the Company for these repurchases of its own stock on September 30, 2019 was over $2.2 million.

123.   According to the Company's 2019 10-K, on September 30, 2019, the Individual Defendants also caused the Company to repurchase 272,369 shares of HF Foods common stock at an average price of $13.30 per share from Defendant Min Ni in exchange for the sale of the outstanding balance of certain Company notes in the amount of $3,622,505.

124.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $3.50 more than the actual worth of each share. Thus, the total over payment by the Company for these repurchases of its own stock on September 30, 2019 was approximately $953,288.

125.   In total, the Company overpaid an aggregate amount of approximately $3.16 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO HF FOODS

126.   As a direct and proximate result of the Individual Defendants' conduct, HF Foods has lost and expended, and will lose and expend, many millions of dollars.

127.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its Co-CEOs, and its current and former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and in connection to the Related Party Misconduct and internal control failures.

128.   Such losses include, but are not limited to, approximately $3.16 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices and the loss in HF Foods' wholesale gross margins.

129.   Additionally, these expenditures include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

130.   As a direct and proximate result of the Individual Defendants' conduct, HF Foods has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

131.   Plaintiff brings this action derivatively and for the benefit of HF Foods to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of HF Foods, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

132.   HF Foods is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.   Plaintiff is, and has continuously been at all relevant times, a shareholder of HF Foods. Plaintiff will adequately and fairly represent the interests of HF Foods in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

134.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

135.   A pre-suit demand on the Board of HF Foods is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Min Ni, Zhang, Ni, and Wang (the "Director-Defendants") and non-party Lin (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors that were on the Board at the time this action was commenced.

136.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to cause the Company to engage in the Related Party Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

137.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to engage in the Related Party Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants

through their false and misleading statements and omissions, the Individual Defendants caused the Company to repurchase its own stock. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

138.   Additional reasons that demand on Defendant Min Ni is futile follow. Defendant Min Ni is the co-founder of the HF Group, and has served as the Company's Chairman and CEO since the merger with Atlantic in 2018, and as Co-CEO of the Company since November 2019. Thus, as the Company admits, he is a non-independent director. Defendant Min Ni's is the beneficial owner of 26.4% of the Company's outstanding shares of common stock, rendering him a controlling shareholder. The Company provides Defendant Min Ni with his principal occupation, and he receives handsome compensation, including $400,000 during fiscal year 2019. Defendant Min Ni and his immediate family members and "affiliates" are intertwined with HF Foods in an overwhelming amount of related party transactions (both disclosed and undisclosed as described herein). Defendant Min Ni was a primary beneficiary of the Related Party Misconduct and was ultimately responsible for the all of the false and misleading statements and omissions that were made, including those contained in the press releases that he signed, and in the 3Q18 10-Q, 2018 10-K, 1Q19 10-Q, 2Q19 10-Q, and 2019 10-K, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Related Party Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Min Ni is a defendant in the Securities Class Actions. For these reasons, too, Defendant Min Ni breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.   Additional reasons that demand on Defendant Zhang is futile follow. Defendant Zhang serves as the Company's Co-CEO and has served in that capacity and as a Company director since November 2019, when the merger with B&R Global took place. He further served as CFO until May 2020. Previously, he served as the Chairman and CEO of B&R Global since he founded it in 2014. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Zhang with his principal occupation, and he receives handsome compensation, including $93,494 during fiscal year 2019.  As the Company's highest officer and as a director, he conducted little, if any, oversight of the Company's engagement in the Related Party Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Zhang has been affiliated with B&R Global since its founding, and thus was aware that it was an undisclosed related entity to HF Foods during the time of the merger. Defendant Zhang's affiliated entities are also engaged in related party sales transactions with HF Foods. Additionally, Defendant Zhang signed, and thus personally made, the false and misleading statements in the 2019 10-K. Furthermore, Defendant Zhang is a defendant in the Securities Class Actions. For these reasons, too, Defendant Zhang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.   Additional reasons that demand on Defendant Ni is futile follow. Defendant Ni has served as a Company director since August 2018, and also serves as a member of the Compensation Committee and the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the Related Party Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Ni

was on the Company's Board throughout the duration of the Relevant Period, and thus was aware of and approved the related party transactions and repurchases discussed herein. Defendant Ni also signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons too, Defendant Ni breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Wang is futile follow. Defendant Wang has served as a Company director since August 2018, except for a one-month period in November 2019 when he stepped down as a member of the Board. Defendant Wang also serves as a member of the Compensation Committee and Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Related Party Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Wang was on the Company's Board throughout the duration of the Relevant Period, and thus was aware of and approved the related party transactions and repurchases discussed herein. Defendant Wang also signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons too, Defendant Wang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142. Additional reasons that demand on the Board is futile follow.

143. Demand in this case is excused because the Director-Defendants are beholden to and controlled by Defendant Min Ni, who controls the Company by virtue of his share ownership, which provided him with approximately 26.4% of total shareholder voting power as of April 20, 2020. These shareholdings provide Defendant Min Ni with significant control over the continued employment of the Director-Defendants. In light

of Defendant Min Ni's control, Defendant Zhang, whose employment with the Company provides him with his principal source of income, is especially not disinterested. Thus, the Director-Defendants are unable to evaluate a demand with disinterest or independence as a result of Defendant Min Ni's control over them.

144. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

145. Defendants Ni and Wang (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, conflicts of interest and related party transactions, compliance with legal and regulatory requirements, the Company's internal control functions, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and further allowed the Company to engage in the Related Party Misconduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

146. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Related Party Misconduct and the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law. In violation of the Code of

Ethics, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

147.   HF Foods has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for HF Foods any part of the damages HF Foods suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

148.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

149.   The acts complained of herein constitute violations of fiduciary duties owed by HF Foods' controlling shareholder, officers and directors, and these acts are incapable of ratification.

150.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of HF Foods. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured

exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of HF Foods, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

151.   If there is no directors' and officers' liability insurance, then the Directors will not cause HF Foods to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

152.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

153.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

155.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

156.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

157.   Under the direction and watch of the directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) HF Foods engaged in the Related Party Misconduct; and (2) the Company was "gaming" FTSE/Russell indices by concealing the actual number of free floating shares. As a result, the Company's statements regarding HF Foods' business, operations, compliance, and prospects were materially false and misleading. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to the Company's engagement in related party transactions. Moreover, the 2019 Proxy Statement represented that the Company purported to employ "pay-for-performance" elements designed to link executive compensation to shareholders' interests while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated. This caused the compensation to executives to be excessive and undeserved. Further, because the shareholders were unaware of the truth, their advisory votes on the executive compensation amounts were uninformed.

158. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the

statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the advisory approval of executive compensation.

159. The false and misleading elements of the 2019 Proxy Statement led to the ratification of Friedman as the Company's independent auditor and the re-election of Defendants Min Ni, Wong, Zheng, Wang, and Ni, which allowed them to continue breaching their fiduciary duties to HF Foods.

160. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

161. Plaintiff on behalf of HF Foods has no adequate remedy at law.

## **SECOND CLAIM**

### **Against Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934**

162. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, provides, in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

164.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding HF Foods. Not only is HF Foods now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon HF Foods by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 905,115 shares of its own securities at artificially-inflated prices, damaging HF Foods.

165.   The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

166.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about HF Foods not misleading.

167.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by HF Foods.

168.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were

available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

169.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

170.   Plaintiff on behalf of HF Foods has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

171.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.   Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action."

173.   The Individual Defendants, by virtue of their positions with HF Foods and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of HF Foods and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause HF Foods to engage in the illegal conduct and practices complained of herein.

174.   Plaintiff on behalf of HF Foods has no adequate remedy at law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

175.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of HF Foods' business and affairs.

177.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

178.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of HF Foods.

179.   In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to engage in or allow the Related Party Misconduct.

180.   In breach of their fiduciary duties owed to HF Foods, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) HF Foods engaged in the Related Party Misconduct; and (2) the Company was "gaming" FTSE/Russell indices by concealing the actual number of free floating shares. As a result, the Company's statements regarding HF Foods' business, performance, and prospects were materially false and misleading.

181.   The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

182.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

183.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of HF Foods' securities.

184.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of HF Foods' securities.

185.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

186.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, HF Foods has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187.   Plaintiff on behalf of HF Foods has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

188.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, HF Foods.

190.   The Individual Defendants either benefitted financially from the improper conduct tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from HF Foods that was tied to the performance or artificially inflated valuation of HF Foods, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

191.   Plaintiff, as a shareholder and a representative of HF Foods, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

192.   Plaintiff on behalf of HF Foods has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

193.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence HF Foods, for which they are legally responsible.

195.   As a direct and proximate result of the Individual Defendants' abuse of control, HF Foods has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, HF Foods has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

196.   Plaintiff on behalf of HF Foods has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

197.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of HF Foods in a manner consistent with the operations of a publicly-held corporation.

199.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, HF Foods has sustained and will continue to sustain significant damages.

200.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

201.   Plaintiff on behalf of HF Foods has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

202.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.   The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, stock grants, or other allowances and also caused the Company to

Verified Shareholder Derivative Complaint

pay out loans, among other inappropriate things, to the detriment of the shareholders and the Company.

204.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused HF Foods to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

205.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

206.   Plaintiff on behalf of HF Foods has no adequate remedy at law.

## **PRAYER FOR RELIEF**

207.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of HF Foods, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to HF Foods;

(c)   Determining and awarding to HF Foods the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing HF Foods and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HF Foods and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to

ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of HF Foods to nominate at least three candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding HF Foods restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 15, 2020          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square

Verified Shareholder Derivative Complaint

Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Jesus Mendoza am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ___6/14/2020___, 2020.

Jesus Mendoza